#27173, #27180-aff in pt, rev in pt & rem-JMK

**2015 S.D. 39**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JASON PETRIK,                                                            Appellant,

v.

JJ CONCRETE, INC. and
EMC INSURANCE COMPANY,                                    Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MARK BARNETT
Judge

\* \* \* \*

MICHAEL D. BORNITZ
JOSEPH M. DYLLA of
Cutler & Donahoe, LLP
Sioux Falls, South Dakota                          Attorneys for appellant.


CHARLES A. LARSON of
Boyce, Greenfield, Pashby
 & Welk, LLP
Sioux Falls, South Dakota                          Attorneys for appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 17, 2015

OPINION FILED **06/03/15**

KERN, Justice

[¶1.]        Jason Petrik (Employee) was injured when he ran from a co-worker on the job site after tricking that co-worker out of an air-conditioned truck. JJ Concrete, Inc. (Employer) and EMC Insurance Company (Insurer) denied workers' compensation benefits to Employee because Employee's act was horseplay and, therefore, the injury did not "arise out of" or "in the course of" his employment. After a hearing, the South Dakota Department of Labor ruled that Employee's injury "arose out of" his employment, but did not occur "in the course of" the employment and denied Employee benefits. The circuit court affirmed. Employee appeals and Employer and Insurer filed a notice of review. We reverse in part, affirm in part, and remand to the Department to establish benefits.

## BACKGROUND

[¶2.]        JJ Concrete employed Jason Petrik as a concrete laborer beginning in 2011. Petrik's duties involved pinning footings, placing stake lines, and setting foundation forms at the job sites. His employment also involved idle times when he and his co-workers were required to wait for other work to be completed before they could continue their own. The idle periods were typical when Petrik and his co-workers were required to wait for a concrete truck to arrive. During these breaks in work, Petrik and his co-workers were expected to clean the site, put away tools, and engage in other miscellaneous duties. Petrik testified that he and his co-workers were friends and would play jokes and tricks on each other. For example, they would fill a lunch box with dirt, put chalk in someone's gloves, or fill a co-worker's bucket with dirt.

[¶3.]     On August 23, 2012, Petrik and his co-workers had completed all their necessary work and were waiting for a concrete truck to arrive to pour concrete. They took their lunch break and waited at the site. It was a hot day and some of the workers were sitting in an air-conditioned JJ Concrete truck. Petrik, wanting to sit in the truck to cool off, went over to the truck and tricked Kevin Cole into getting out. He told Cole that one of their co-workers on the other side of the job site needed to talk to him. Cole left the truck, after which Petrik took his seat inside the truck.

[¶4.]     Once seated, Petrik smoked a cigarette and cooled off. After about five minutes, he left the truck to return to the job site. He saw Cole and took off running. Cole ran after Petrik, and, during this short chase, Petrik attempted to jump across a trench, landed awkwardly, and broke his ankle. The trenches were built to hold concrete footings and are typically five feet wide and two or three feet deep, although Petrik testified that this trench was approximately four feet wide. Petrik, realizing the seriousness of his injury, notified his employer of the injury and had Cole take him to the hospital.

[¶5.]     After the injury, Petrik sought workers' compensation benefits. JJ Concrete and EMC Insurance Company refused to pay for Petrik's medical expenses and refused to provide temporary total disability benefits. They asserted that Petrik's injury did not "arise out of" and was not "in the course of" his employment because Employer specifically prohibited horseplay by the employees. Also, Petrik's act of running on a dangerous job site in no way furthered the business interests of Employer. In November 2012, Petrik petitioned the Department of Labor for a

hearing, which was held on May 22, 2013. Petrik asserted that his brief and insignificant horseplay arose "out of" and was "in the course of" his employment, because horseplay was to be expected when employees have repeated and mandatory lulls in their workday.

[¶6.]    After the hearing and in consideration of the testimony and post-hearing briefs by the parties, the Department issued a memorandum decision, and findings of fact and conclusions of law. The Department held that Petrik's injury arose "out of" his employment because "[b]ut for his work with Employer he would not be at the job site where he was injured." The Department next examined whether Petrik's injury occurred "in the course of" his employment. It recognized that "in the course of the employment" refers to the time, place, and circumstances of the injury. The Department then applied the four factors adopted by this Court in a case involving horseplay. *See Phillips v. John Morrell & Co.*, 484 N.W.2d 527, 530 (S.D. 1992).

[¶7.]    On the first factor—the extent and seriousness of the deviation—the Department found that running through a job site with many hazards out in the open is serious conduct. The Department also emphasized that Employer did not expect Petrik to deviate from his job and run through the site and, in fact, Employer prohibited horseplay. The Department then addressed the second factor—the completeness of the deviation—and found that Petrik "completely deviated from abiding by Employer's safety rules, when he ran through the job site." On the third factor, which examines the employer's rules and practices, the Department referred to Employer's employee manual, safety trainings, and employee testimony that

running was prohibited. It found that, though practical jokes were accepted "as clean fun at work," horseplay was not. Lastly, the Department found that the nature of concrete work would not involve such horseplay because Petrik's job required heavy lifting and manual labor and "[w]hen the employees have an hour or so to wait, the employees typically save their energy for when they have to expend it working."

[¶8.] Based on its review of the four factors, the Department concluded that Petrik's act of running on the job site and attempting to jump over a trench was a substantial deviation from his employment and, therefore, was not "in the course of the employment." It ruled that Employer and Insurer were not responsible for Petrik's medical and indemnity benefits. Petrik appealed this determination to the circuit court. Employer and Insurer appealed the Department's determination that the injury arose "out of" Petrik's employment. The circuit court did not address Employer and Insurer's issue because it affirmed the Department's decision that Petrik's act of horseplay did not occur "in the course of" his employment.

[¶9.] Petrik appeals to this Court, asserting that the Department erred as a matter of law when it ruled that his act of horseplay did not occur "in the course of" his employment. By notice of review, Employer and Insurer assert that the Department erred when it ruled that Petrik's injury arose "out of" his employment.

## STANDARD OF REVIEW

[¶10.] "Our standard of review is controlled by SDCL 1-26-37." *Kuhle v. Lecy Chiropractic*, 2006 S.D. 16, ¶ 15, 711 N.W.2d 244, 247 (quoting *Kassube v. Dakota Logging*, 2005 S.D. 102, ¶ 25, 705 N.W.2d 461, 465). We review the Department's

decision "in the same manner as the circuit court," and "[t]he circuit court's determination is not presumed to be correct." *Fair v. Nash Finch Co.*, 2007 S.D. 16, ¶ 5, 728 N.W.2d 623, 627. The Department's conclusions of law are reviewed de novo, but we give deference to its findings of fact. *Kuhle*, 2006 S.D. 16, ¶¶ 15-16, 711 N.W.2d at 247. Only when its findings are clearly erroneous, will we overturn the Department's factual determinations. *Id.* ¶ 15.

### ANALYSIS

[¶11.] To recover under South Dakota's workers' compensation laws, Petrik must prove by a preponderance of the evidence that he sustained an "injury arising out of and in the course of the employment[.]" *See* SDCL 62-1-1(7); *Mudlin v. Hills Materials Co.*, 2005 S.D. 64, ¶ 7, 698 N.W.2d 67, 71. "[A]rising out of" and "in the course of" are independent factors relevant to "the general inquiry of whether the injury or condition complained of is connected to the employment." *Id.* ¶ 9. Indeed, "the factors are prone to some interplay and 'deficiencies in the strength of one factor are sometimes allowed to be made up by the strength in the other.'" *Id.* (quoting *Norton v. Deuel Sch. Dist.*, 2004 S.D. 6, ¶ 11, 674 N.W.2d 518, 521). Moreover, "application of the workers' compensation statutes is not limited solely to the times when the employee is engaged in the work that he was hired to perform." *Id.* ¶ 8. Rather, we construe "arising out of and in the course of" liberally in favor of injured employees. *Bender v. Dakota Resorts Mgmt. Grp., Inc.*, 2005 S.D. 81, ¶ 8, 700 N.W.2d 739, 742. Moreover, "workers' compensation is the exclusive remedy against employers for all on-the-job injuries to workers except those injuries intentionally inflicted by the employer." *Steinberg v. S.D. Dep't of Military &*

*Veteran Affairs*, 2000 S.D. 36, ¶ 14, 607 N.W.2d 596, 601. It is designed to replace the "common law's doubtful tort based recovery system with a system based on a right to relief upon establishing the fact of employment, 'automatic and certain, expeditious and independent of proof of fault.'" *Grauel v. S.D. Sch. of Mines & Tech.*, 2000 S.D. 145, ¶ 14, 619 N.W.2d 260, 264 (emphasis omitted) (quoting *Steinberg*, 2000 S.D. 36, ¶ 15, 607 N.W.2d at 602).

### 1. "Arising out of the employment"

[¶12.] To prove that his injury arose "out of" the employment, Petrik must prove that there exists a causal connection between the injury and the employment. "The employment need not be the direct or proximate cause of the injury[;] rather it is sufficient if 'the accident had its origin in the hazard to which the employment exposed the employee while doing [his] work.'" *Mudlin*, 2005 S.D. 64, ¶ 11, 698 N.W.2d at 71 (quoting *Norton*, 2004 S.D. 6, ¶ 8, 674 N.W.2d at 521). Therefore, an injury will be deemed to have arisen out of the employment if: 1) the employment "contributes to causing the injury; or 2) the activity is one in which the employee might reasonably be expected to engage; or 3) the activity brings about the disability upon which compensation is based." *Norton*, 2004 S.D. 6, ¶ 8, 674 N.W.2d at 521.

[¶13.] Employer and Insurer assert that the Department erred when it ruled that Petrik's injury arose "out of" his employment. They contend the Department misapplied the law when it said that, "but for" being on the job site, Petrik would not have been injured and, therefore, the injury "arose out of the employment." Employer and Insurer assert that a "but for" standard would mean every injury will

arise out of the employment when someone is at work. Thus, in Employer and Insurer's view, for an injury to "arise out of the employment," the act must be in the interest of or on behalf of the employer.

[¶14.]       It is true that Petrik's act of running on the job site had no direct connection with or relation to the *work* Petrik was to perform. Yet Petrik's employment contributed to the cause of his injury. He was injured during a period of time in which he was required to standby and remain idle until the concrete truck arrived. *See id.* Further, the activity—playing a prank on a co-worker during an idle period—is one in which employees might reasonably engage. *See id.* (providing alternative ways to assess "arising out of the employment"). Therefore, the Department did not err when it ruled that Petrik's injury arose out of his employment. *See Phillips*, 484 N.W.2d at 530 (the injury arose out of the employment because it had its origin in the hazard exposed by the employment).

## 2. "In the course of the employment"

[¶15.]       "'[I]n the course of employment' refer[s] to 'the time, place and circumstances of the injury.'" *Mudlin*, 2005 S.D. 64, ¶ 15, 698 N.W.2d at 73 (quoting *Bearshield v. City of Gregory*, 278 N.W.2d 166, 168 (S.D. 1979)); *see also Progressive Halcyon Ins. Co. v. Philippi*, 2008 S.D. 69, ¶ 21, 754 N.W.2d 646, 654; *Fair*, 2007 S.D. 16, ¶ 11, 728 N.W.2d at 629. "'An employee [will be] considered in the course of the employment if he is doing something that is either naturally or incidentally related to his employment or which he is either expressly or impliedly authorized to do by the contract or nature of the employment.'" *Mudlin*, 2005 S.D. 64, ¶ 15, 698 N.W.2d at 73 (quoting *Bearshield*, 278 N.W.2d at 168).

[¶16.] 	In *Phillips*, a case of first impression, this Court analyzed whether an employee engaged in horseplay could be "in the course of" his employment when injured as a result of that horseplay. 484 N.W.2d at 530-32. Phillips was working on an assembly line in a packing plant removing sperm cords from hogs suspended on a chain passing by every 3.5 seconds. *Id.* at 528-29. The cords were described as straw-like and were to be disposed of on a conveyor belt. In an act of horseplay, Phillips tossed the cords at a co-worker, and, in response, the co-worker waived his knife at Phillips stabbing him in the leg. *Id.* at 529.

[¶17.] 	To determine whether Phillips's act of horseplay was within the course of his employment, the Court adopted four factors to consider, which included:

> whether initiation of horseplay is a deviation from course of employment depends on: (1) the extent and seriousness of the deviation, (2) the completeness of the deviation (i.e., whether it was commingled with the performance of duty or involved an abandonment of duty), (3) the extent to which the practice of horseplay had become an accepted part of the employment, and (4) the extent to which the nature of the employment may be expected to include some such horseplay.

*Id.* at 530 (quoting 1A *Larson's Workmen's Compensation Law* § 23.00 (1990)). Courts have noted that not all factors need to be present to allow a finding that the horseplay was "in the course of" the employment. Arthur Larson, *Larson's Workers' Compensation Law* § 23.01 (2014) (hereinafter 2 Larson). Thus, "the absence of the last two elements does not rule out the possibility that, under the first two elements, the claimant engaged in such minor horseplay that it did not fall outside the scope of employment." *Panera Bread, LLC v. Indus. Claims Appeals Office*, 141 P.3d 970, 973 (Colo. Ct. App. 2006). The Court applied the factors and found that Phillips's deviation was not serious, because throwing the cords was not likely to

cause harm and his work product was not affected. *Phillips*, 484 N.W.2d at 531. With reference to the second factor, the Court noted that Phillips's horseplay was commingled with his work duties. Further, the Court found that, although his employer had a rule against horseplay, some was tolerated to varying degrees. Finally, the Court noted that, in monotonous assembly line jobs, "some new stimulus becomes necessary to relieve the tedium. For the worker, some moderate amounts of horseplay operate as that stimulus." *Id.* The Court concluded that Phillips's act of horseplay was "in the course of" his employment, and he was entitled to compensation. We turn then to apply these factors to Petrik's act of horseplay.

### a. extent and seriousness of the deviation

[¶18.] Petrik contends the Department erred because it failed to take into account the fact that there was a lull in work when assessing the extent of the deviation. This case is different than *Phillips*, he claims, because the horseplay occurred when he and his co-workers were forced to remain idle until the concrete truck arrived. There was no work to abandon, and, relying on Larson, Petrik claims "that the duration and seriousness of the deviation which will be called substantial should be somewhat smaller when the deviation necessitates the dropping of active duties than when it does not." *See* 2 Larson, *supra* ¶ 17, at § 23.07[5].

[¶19.] Employer and Insurer, on the other hand, claim that there is idleness in every job and, therefore, idleness should not be a reason to hold Employer and Insurer responsible for Petrik's "mischief." They emphasize that running through a job site with hazards out in the open is dangerous and serious, and Petrik knew his

conduct was wrong and against Employer's rules.  The extent of the deviation was substantial, according to Employer and Insurer, because the horseplay had nothing to do with his employment, but "was the result of him screwing around, a personal frolic[.]"

[¶20.]     In *Phillips*, we noted that the extent and seriousness of the deviation does not take into account the consequences or the resulting injury.  484 N.W.2d at 530.  Rather, the substantial character of the deviation must be based on the extent of the departure from work in itself.  Yet the Department did not specifically examine the effect of the lull in work in assessing the extent of the deviation.  It focused on the fact that Employer prohibited horseplay, and Petrik knew running through the job site was dangerous.  These considerations are relevant to factor three.

[¶21.]     Therefore, based on Larson and cases from other courts, we find it critical to our consideration on factor one whether the act of horseplay occurred when there was a lull in work.  *See* 2 Larson, *supra* ¶ 17, at § 23.07[5]; *Grabowski v. Mangler*, 956 A.2d 1217, 1221-22 (Del. 2008); *Jean Fluet, Inc. v. Harrison*, 652 So. 2d 1209, 1212 (Fla. Dist. Ct. App. 1995) (the lull factor is treated with special consideration); *Bruns Volkswagen, Inc. v. Dep't of Indus., Labor & Human Relations*, 328 N.W.2d 886, 889 (Wis. Ct. App. 1982); *see also Times Pub. Co. v. Walters*, 382 So. 2d 720, 721 (Fla. Dist. Ct. App. 1980); *Singleton v. Younger Bros., Inc.*, 247 So. 2d 273, 276 (La. Ct. App. 1971).  This is because, when there are no duties to perform, there is no work to abandon and "it is common knowledge, embodied in more than one old saw, that idleness breeds mischief, so that if idleness

is a fixture of the employment, its handmaiden mischief is also." 2 Larson, *supra*

¶ 18, at § 23.07[5]. This is not "to say that no horseplay enterprise undertaken

during enforced idleness constitutes a deviation"—it is simply a factor relevant to

the extent of the deviation. *See id.* (footnote omitted).

[¶22.]     Taking into account the fact that Petrik and his co-workers were

required to wait at the job site for a concrete truck to arrive, we examine the extent

and seriousness of the deviation. No doubt running through the job site was

dangerous, and in retrospect, it was foolish on Petrik's part. However, he had no

duties to perform and was required to wait for the truck in order to accomplish his

next task. It was a hot day, and Petrik wanted to cool off in the air-conditioned

company truck. He tricked Cole out of the truck and sat inside the truck for a few

minutes. Once outside of the truck, he saw Cole and took off running. He described

it as an impulse. Cole testified to the same—that he ran after Petrik out of impulse.

However misguided, the extent of Petrik's momentary and impulsive deviation

during a lull in work was insubstantial. *See Bruns Volkswagen, Inc.*, 328 N.W.2d at

889 (while waiting for parts at a repair shop, employee and a mechanic began

wrestling); *Dunlevy v. Seminole Cnty. Dep't of Pub. Safety*, 792 So. 2d 592, 594 (Fla.

Dist. Ct. App. 2001) (while coming off duty, a firefighter joked with another

firefighter coming on duty and wrestled around); *Williams v. Hydro Print, Inc.*, 308

S.E.2d 478, 484 (N.C. Ct. App. 1983) (while on a rest break employee and co-

employees ran toward a shiny object that seemed to be "glittering").

### b. completeness of the deviation

[¶23.] This factor looks to whether the act was commingled with the performance of a duty or whether it involved a complete abandonment of job duties. *Phillips*, 484 N.W.2d at 530. The Department recognized that Petrik did not commingle or abandon any of his job duties. Yet, it found against Petrik on this factor because Petrik "completely deviated from abiding by Employer's safety rules." Again, Employer's safety rules are relevant in factor three. On this particular factor, it is arguable that Petrik's act was comingled with the performance of his job duty. At the time of his injury, the only duty Petrik was to perform was to be on standby until the concrete truck arrived. Though he engaged in prohibited horseplay, the act was accomplished while Petrik was waiting for the concrete truck. Even so, the evidence supports the Department's finding that Petrik did not abandon his job duties.

### c. extent to which horseplay has become an accepted part of the employment

[¶24.] There is no dispute that running through the job site had not become an accepted part of Petrik's employment. He testified that he knew it was against Employer's rules. Employer testified that it issued each employee, including Petrik, an employee manual that contained a safety policy. Employer emphasized that it did not tolerate horseplay. Although Petrik and his co-workers testified that they engaged in minor jokes and pranks, there is no evidence that running on the job site was a regular occurrence.

### d. the extent to which the nature of the employment may be expected to include some such horseplay

[¶25.] The Department recognized that the "nature of the employment, especially during the waiting times, may be expected to involve some sort of joking or pranks by coworkers." However, it did not believe that the type of horseplay engaged in by Petrik would be expected because the nature of the work required heavy lifting and manual labor. The Department submitted that, "[w]hen the employees have an hour or so to wait, the employees typically save their energy for when they have to expend it working."

[¶26.] On appeal to the circuit court and this Court, Petrik argues that horseplay of this type is to be expected in occupations requiring manual labor. Concrete work, according to Petrik, is "difficult and repetitive." He and his co-workers would give each other a hard time and would joke, goof around, and engage in horseplay. Employer and Insurer, on the other hand, insist that the type of horseplay engaged in by Petrik is not the type expected in the nature of Petrik's employment as a concrete laborer. They further argue that because concrete work is not monotonous like packing-plant-line work in *Phillips*, there was no reason for horseplay to be expected. In Employer and Insurer's view, "[e]very job is repetitive, but that does not mean . . . people screwing around should be awarded workers' compensation benefits when their horseplay causes their injury."

[¶27.] Multiple courts have found that "[e]mployers, whose work requires that men wait upon the job for work conditions, ought not to be heard to say that an accident, occurring out of the very conditions presented by the required waiting, is not compensatory." *Gillmore v. Ring Constr. Co.*, 61 S.W.2d 764, 766 (Mo. Ct. App. 1933); *see also Singleton*, 247 So. 2d at 276. Additionally, employees whose job

requires them to expend "physical energy cannot be expected, during slack period, to sit in idleness and gossip. The employer must expect that they will engage in some form of activity." *Meigel v. Gen. Foods Corp.*, 2 A.D.2d 945, 945 (N.Y. App. Div. 1956); *see also Dehart v. Betty Breaux Pers., Inc.*, 535 So. 2d 456, 458 (La. Ct. App. 1988).

[¶28.]    The Department's finding that heavy lifting and manual labor would motivate employees to save their energy for when they have to expend it is not borne out in the record. There is no expert testimony that, in the industry of concrete work, manual laborers will sit and relax during idle times instead of using their energy to engage in horseplay. And the testimony of one employee that he believes the employees would rest and relax does not create a standard by which to judge all employees at JJ Concrete. It is undisputed that Petrik's employment required him and his co-workers to wait while on the job. The co-workers were all friends and admittedly like to engage in friendly banter and joke together to pass the time. It is, therefore, expected that in the nature of this employment certain horseplay would occur. In fact, courts have recognized for decades that "even [employees] of maturer years [will] indulge in a moment's diversion from work to joke with or play a prank upon a fellow [employee]." *Clodgo v. Rentavision, Inc.*, 701 A.2d 1044, 1045 (Vt. 1997) (citing *Leonbruno v. Champlain Silk Mills*, 128 N.E. 711, 711 (N.Y. 1920)).

[¶29.]    Having reviewed all four factors, the facts of this case present a close question on whether Petrik's act of horseplay was a substantial deviation. There is no doubt that running on a construction job site is serious. Moreover, Employer

stressed safety in the workplace and prohibited horseplay. Petrik also testified that he knew running on the job site was dangerous and against his employer's rules. Yet "[u]nder the workers' compensation acts, the theory of negligence as the basis of liability is discarded." *See Steinberg*, 2000 S.D. 36, ¶ 27, 607 N.W.2d at 605. Petrik's deviation lasted mere moments and was the result of an impulsive response. Granted, in hindsight, running on the job site was misguided, but Petrik's act did not come from a deliberate or conscious excursion and did not require him to abandon any job duties. *See Greisman v. N.Y. State Dep't of Transp.*, 33 A.D. 2d 1086, 1086 (N.Y. App. Div. 1970) (per curiam); *Mitchell v. Sanborn*, 536 N.W.2d 678, 685 (N.D. 1995).

## CONCLUSION

[¶30.] The Department correctly concluded that Petrik's injury arose "out of" the employment. The Department, however, erred when it did not consider the effect of the lull in work when it applied the Larson factors to determine whether Petrik's injury occurred "in the course of the employment." From our review of the record, Petrik's act of horseplay was not a substantial deviation from his employment and, therefore, occurred "in the course of the employment." It is well-settled in this State that our workers' compensation laws are "'remedial in character and entitled to a liberal construction.'" *Phillips*, 484 N.W.2d at 531 (quoting *Oviatt v. Oviatt Dairy, Inc.*, 80 S.D. 83, 85, 119 N.W.2d 649, 650 (1963)). Moreover, the liberal construction must be in favor of the injured worker. *Waterman v. Morningside Manor*, 2013 S.D. 78, ¶ 22, 839 N.W.2d 567, 573.

Therefore, we affirm in part, reverse in part, and remand to the Department for an award of workers' compensation benefits.

[¶31.]        GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.