# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>November 28, 2018</u>

**No. A-1-CA-36048**

**AMANDA MOTES,**

      Worker-Appellee,

v.

**CURRY COUNTY ADULT DETENTION
CENTER and NMCIA,**

      Employer/Insurer-Appellants.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION
Terry S. Kramer, Workers' Compensation Judge**

Sanders, Bruin, Coll & Worley, P.A.
Beth L. Hightower
Clayton S. Hightower
Roswell, NM

for Appellee

Hatcher Law Group, P.A.
Scott P. Hatcher
Mark A. Cox
Santa Fe, NM

for Appellants

**OPINION**

**ATTREP, Judge.**

{1}    Curry County Adult Detention Center (Employer or the detention center) and New Mexico County Insurance Authority (Insurer) appeal a Workers' Compensation Judge's (the WCJ) order awarding compensation to Worker Amanda Motes for injuries she sustained while engaged in horseplay on Employer's premises. Employer and Insurer contend Worker is not entitled to compensation because, given the nature of the horseplay, she cannot establish her injuries arose out of and in the course of her employment as required for compensability by NMSA 1978, Section 52-1-28(A)(1) (1987) of the Workers' Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2017). We hold that substantial evidence supports the WCJ's findings and the WCJ did not err in concluding Worker's injuries are compensable under the Act. We affirm the compensation order.

**BACKGROUND**

{2}    Worker had been working at the detention center as a booking specialist for approximately five weeks when she sustained the injuries at issue in this appeal. As a booking specialist, Worker was responsible for the "overall operation" of the booking room and file room at the detention center. Her duties generally involved classifying and booking new inmates, receiving and recording incoming

paperwork, medication, and visitors, and performing related filing obligations, along with various other unspecified responsibilities. In her first week on the job, she worked the day shift and trained with direct supervisors in the booking department. After that initial training period, Worker made the switch to the night shift.

{3} None of her direct supervisors in the booking department and no senior officials in her direct chain of command worked nights. Instead, typically the most senior employees on duty at night were sergeants who worked in the detention chain of command, as opposed to the booking chain of command, and oversaw the operations of more junior detention officers at the detention center. These sergeants also served as "supervisory employee[s]" for the facility more generally and served as the first point of contact for more junior employees from all departments, including the booking department, when questions or concerns arose. The sergeants worked from different duty stations interspersed among the departments; the specific station assignment varied night to night.

{4} Sergeant Jayson Cloud worked as a supervisory sergeant on the night shift along with other sergeants, and he worked the night Worker sustained her injuries. Cloud had worked at the detention center for approximately three years at the time of Worker's injuries. He had accrued a short history of discipline in his time there—he had been counseled twice for use of obscene or abusive language toward

inmates and staff, suspended for conduct unbecoming a county employee, counseled for overriding facility doors while inmates were present, and reprimanded for failing to report for shifts.

{5}    The detention center's workload at night ebbed and flowed, and the sergeants and employees in booking and in detention often had downtime. Curry County (the County) had promulgated and distributed a safety manual to all county employees, including those employed at the detention center. The manual prohibited horseplay by employees and advised that horseplay "may subject" employees to disciplinary action at the discretion of department heads. Worker and Cloud both signed forms acknowledging they had read and understood the manual's terms. County Manager Lance Pyle, who gave deposition testimony for the WCJ's consideration, could not recall whether Worker or Cloud had been given any specific safety training above and beyond the instructions provided in the County's safety manual, and he could not produce any documentation recording their attendance at any safety training sessions the County did provide from time to time.

{6}    Worker and Cloud had established a history of interacting in an apparently lighthearted way when downtime arose at the detention center. Worker testified that Cloud had "made it his life goal to terrorize [her] at any given moment." She added that they had on previous occasions attempted to mark each other with

3

markers and spray each other with bug spray and that Cloud "would do stuff like that all the time." Cloud confirmed they had in the past attempted to mark each other with markers, describing the frequency as "from time to time."

{7}    Worker observed that theirs was not unique behavior at the detention center, recalling, "I [knew] a lot of people there that [did] engage in horseplay, they [did] have that sort of camaraderie between each other . . . A lot of the officers [did], the booking officers, and the actual guards themselves." Other sergeants, she added, engaged in similar ways during downtime and, she reported, "it was one of those things where it had become a custom . . . I didn't think anything of it . . . because it was something that I saw often." Worker also testified, in response to a question about whether she had raised the subject of horseplay with her direct supervisors, that she had let a supervisor know Cloud often "irritated" her. The supervisor, however, brushed her off, observing that "that was how [Cloud] was." By contrast, Pyle testified that he was unaware the detention center had this culture of activity during periods of downtime at all, and he emphasized that if the culture existed, "it should have been reported" so that the County could take "immediate action." But neither Pyle nor Cloud could recall any reports or complaints to supervisors regarding the activity, and Pyle reiterated that if reports had in fact been made, the County would have investigated and taken action as appropriate.

**{8}** On the night she sustained her injuries, Worker recalled that work was slow and she was sitting, waiting in the booking area. A few hours after her shift began, she and Cloud engaged and attempted to mark each other with markers, as they had in the past. Cloud withdrew, stepped into a nearby bathroom, and returned with a can of bug spray. He feigned spraying Worker with the bug spray, and then retreated out of the booking area. Worker gave chase, running, but she tripped on a short staircase exiting the booking area. Her fall resulted in a broken right ankle and fibula. The entire interaction from the initial engagement to the fall, Worker testified, occurred in a span of a few minutes or less, as one continuous exchange. Worker and Cloud both testified this was the first time their downtime interaction had involved running.

**{9}** Worker eventually sought and received medical attention for her injuries and reported the accident to Employer. After some consultation with Cloud, Worker gave a fabricated account of the events giving rise to the injuries in her initial report, fearing she might lose her job and receive no compensation for the injury were the actual story to come out. Cloud signed off on the report. The County made its standard investigation of the report and reviewed surveillance video at the detention center from the night Worker sustained her injuries. After observing the incident on video as it actually transpired, the County realized Worker had falsified the initial report.

5

{10} This was not the first time surveillance video had revealed Worker committing an infraction at the detention center, as she had previously been seen on video using her phone in an area where phone use was prohibited and was counseled for that infraction. Although Worker testified that the surveillance cameras were monitored around the clock from a station near the booking area, the record does not reveal when or under what conditions any surveillance might have been reported up a chain of command. Based on her prior discipline, Cloud's disciplinary history, the circumstances surrounding the accident observed in the surveillance video, and the falsification of the accident report, Employer eventually fired both Worker and Cloud.

{11} Worker sought workers' compensation for her injuries, believing they constituted compensable accidental work injuries. Employer took the position that Worker's injuries had arisen not from and in the course of her employment as required by statute, but instead from non-compensable horseplay. At trial, the WCJ heard testimony from Worker and argument from the parties regarding the dispute. The parties also submitted depositions from Cloud and Pyle, along with various other exhibits and proposed findings of fact and conclusions of law, for the WCJ's consideration in making the compensation determination.

{12} In the compensation order, the WCJ made various findings in evaluating the coverage question. The WCJ found, among other things, that the injury took place

during normal work hours and on Employer's premises, that "Cloud had engaged in horseplay with Worker on previous occasions[,]" and that "Employer had not counseled either [Sergeant] Cloud or Worker concerning horseplay any time prior to the . . . incident." The WCJ added that "Employer did nothing to curtail the repeated horseplay at any time prior to the . . . incident." The WCJ further found that Cloud was the supervisor in charge at the time of Worker's injury and that "Employer had surveillance cameras throughout the detention center." The WCJ also declined to adopt Employer's proposed findings that "[h]orseplay is further not tolerated at [the] County and particularly in the secured areas such as the booking area of the . . . .[d]etention [c]enter," and that "[the] County, including the . . . [d]etention [c]enter, does not have a 'culture' of horseplay." Those proposals stood in contrast to Worker's proposed finding that "horseplay [was] commonplace at the [d]etention [c]enter"—a finding implicitly, if not explicitly, adopted by the WCJ. Based on his findings, the WCJ concluded Worker's injury was compensable under the Act and entered a compensation order in her favor. Employer and Insurer timely filed this appeal.

**DISCUSSION**

{13}     Employer and Insurer raise several factual and legal arguments in response to the WCJ's compensation order. They contend the record cannot support the WCJ's finding that Cloud was a supervisor at the detention center such that any

7

knowledge he had, and any toleration he exhibited, regarding a custom of horseplay at the facility might be imputed to Employer. They also dispute the finding that Employer had notice of past horseplay at the detention center based on Employer's operation of surveillance cameras. Employer and Insurer present those factual challenges in support of their main legal argument—that the Act and our prior cases examining horseplay establish a threshold requirement for compensation that an employer have notice of a history of horseplay in the employment environment. They maintain that Worker has not established the requisite notice as a matter of law, and thus contend the WCJ erred in concluding Worker's injuries are compensable under the Act.

**I.      Standard of Review**

{14}     We review the whole record in workers' compensation cases to determine whether substantial evidence supports the WCJ's findings. *See Lewis v. Am. Gen. Media*, 2015-NMCA-090, ¶ 17, 355 P.3d 850. We review the evidence in the light most favorable to the decision, and we defer to the WCJ's resolution of conflicts in the evidence. *See Rodriguez v. McAnally Enters.*, 1994-NMCA-025, ¶ 11, 117 N.M. 250, 871 P.2d 14. In cases involving "uncertain, doubtful, or ambiguous findings," we are "bound to indulge every presumption to sustain the judgment." *Kincaid v. WEK Drilling Co.*, 1989-NMCA-111, ¶ 28, 109 N.M. 480, 786 P.2d 1214 (operating under prior version of Rule 1-052(A) NMRA); *see also Jones v.*

8

*Auge*, 2015-NMCA-016, ¶ 2, 344 P.3d 989 (explaining that "on appeal, a reviewing court liberally construes findings of fact adopted by the fact finder in support of a judgment" and "such findings are sufficient if a fair consideration of all of them taken together supports the judgment entered below" (alteration, internal quotation marks, and citations omitted)). In reviewing the whole record, we examine the findings both expressly and implicitly made, along with any refusals to adopt proposed findings proffered by a party, in determining whether the WCJ's final conclusions are justified. *See Molinar v. Larry Reetz Constr., Ltd.*, 2018-NMCA-011, ¶ 42, 409 P.3d 956 (examining "express" and "concomitant implied" findings); *Jones v. Beavers*, 1993-NMCA-100, ¶ 18, 116 N.M. 634, 866 P.2d 362 (explaining that "[t]he trial court's refusal to adopt the requested findings of fact is tantamount to a finding against [the requesting party] on each of these factual issues"); *see also State ex rel. King v. UU Bar Ranch Ltd. P'ship*, 2009-NMSC-010, ¶ 44, 145 N.M. 769, 205 P.3d 816 ("When a trial court rejects proposed findings of facts or conclusions of law, we assume that said facts were not supported by sufficient evidence."). We review de novo the WCJ's application of law to the facts found, and we may affirm the WCJ's order if it reaches the right result, even for reasons the order does not address. *See Maez v. Riley Indus.*, 2015-NMCA-049, ¶ 31, 347 P.3d 732. Finally, to the extent the dispute here raises questions about the appropriate interpretation of the Act, we review such questions

de novo. *See Romero v. Laidlaw Transit Servs., Inc.*, 2015-NMCA-107, ¶ 8, 357 P.3d 463.

## II. Compensable Injuries Under the Act

{15} The Act directs that claims for compensation are only to be allowed "when the worker has sustained an accidental injury arising out of and in the course of his employment[.]" Section 52-1-28(A)(1); *see also Rodriguez v. Permian Drilling Corp.*, 2011-NMSC-032, ¶ 9, 150 N.M. 164, 258 P.3d 443 ("The Act provides the exclusive remedy for an employee to receive compensation for an injury arising out of and in the course of his employment." (internal quotation marks and citation omitted)). That an injury may be caused entirely by the negligence of the injured does not generally change the compensation determination. *See* § 52-1-8(C) ("In an action to recover damages for a personal injury sustained by an employee . . . it shall not be a defense . . . that the injury . . . was caused, in whole or in part by the want of ordinary care of the injured employee where such want of care was not willful."). Instead, the relevant language presents two distinct conditions for compensation: (1) the "arising out of" condition typically calls for a kind of causation analysis, while (2) the "in the course of" condition makes reference "to the time, place[,] and circumstances under which the injury occurred." *Wilson v. Richardson Ford Sales, Inc.*, 1981-NMSC-123, ¶ 9, 97 N.M. 226, 638 P.2d 1071. Both conditions are satisfied where an injury can be characterized as "reasonably incidental to the employment" or "flowing [from the employment] as a natural consequence." *Id.* Whether an injury can be described as reasonably incidental to

11

the employment will depend "upon the practices permitted" in the employment and "the customs of the employment environment generally." *Id.* (internal quotation marks and citation omitted). More recently, our Supreme Court has observed a critical inquiry in evaluating the Act's two compensation conditions is whether "the injury was sustained during the commission of an activity that is reasonable and foreseeable both as to its nature and manner of commission." *Rodriguez*, 2011-NMSC-032, ¶ 9 (internal quotation marks and citation omitted).

**III.    Injuries Resulting From Horseplay**

{16}    In horseplay cases, which have not often been examined in New Mexico, we have elaborated on the standard inquiry. Historically, both participants and non-participants were out of luck when it came to recovering for injuries caused by horseplay—their injuries were said not to have arisen from and in the course of employment but from some risk foreign to the employment environment. *See Woods v. Asplundh Tree Expert Co.*, 1992-NMCA-046, ¶ 7, 114 N.M. 162, 836 P.2d 81. This rule was then relaxed for non-participants, as courts observed the risks created by fellow workers might often constitute risks of the employment environment itself. *Id.* Participants, by contrast, often remained without a route to recovery. *Id.* Eventually, however, the participant/non-participant distinction fell out of favor; and in *Woods*, this Court recognized a longstanding "trend against the rule denying recovery solely on the basis of participation [in horseplay] and toward

the elimination of distinctions based on fault." *Id.* ¶ 10. We observed that two tests for evaluating compensability had gained prominence in other jurisdictions, both of which had been shaped by the trend. *See id.* ¶¶ 8, 11-12 (identifying the "New York rule" and the "course of employment test"). Both, we determined, reflected critical compensation inquiries consistent with New Mexico law. *Id.* ¶¶ 13-14, 27. We thus concluded both tests may often be useful in determining whether horseplay injuries satisfy the Act's "arising out of" and "course of employment" requirements. *Id.*; *see also Esckelson v. Miners' Colfax Med. Ctr.*, 2014-NMCA-052, ¶ 8, 324 P.3d 393 (confirming, more recently, that the *Woods* analysis applies to "cases in which a worker is injured while engaging in horseplay").

{17} The first test *Woods* identified had come to be known as the "New York rule." *Woods*, 1992-NMCA-046, ¶ 8. The test asks simply whether the activity giving rise to the injury had "become a regular incident of the employment, rather than an isolated act." *Id.* Our analysis in *Woods* revealed that two basic considerations should guide the application of the New York rule. *See id.* ¶ 21. First, we examined the nature and extent of prior activity similar to the activity giving rise to the injury. And second, we considered the nature of the specific employment environment more generally and whether it may be expected to include activity similar to that giving rise to the injury. *Id.*

**{18}** The second compensability test, which *Woods* identified as "the course of employment test," asks a different question—evaluating whether the activity giving rise to the injury amounts "to a substantial deviation from the employment." *Id.* ¶ 11 (internal quotation marks and citation omitted). Under this test, injuries remain compensable unless they have arisen from substantial deviations. *Id.* We highlighted in *Woods* several considerations that should guide the evaluation of whether a horseplay deviation is substantial. *See id.* ¶ 22. Those considerations include: (1) the scope and gravity of the deviation; (2) the completeness of the deviation; (3) the extent to which horseplay has become an accepted part of the employment environment; and (4) the extent to which the specific employment environment may be expected to include "such horseplay." *Id.* Given those considerations, we observed in *Woods* that application of the course of employment test may often render more injuries compensable than application of the New York rule. *Id.* ¶ 24. This is the case because injuries arising from various isolated acts, for example, which might fail under the New York rule, might nevertheless be coverable under the course of employment test. *Id.* But whether an injury may be compensable under one test but not the other, the *Woods* court cautioned, should not generally matter—the worker "should be able to prevail in New Mexico if he or she can factually satisfy either one." *Id.* ¶ 13.

14

{19} Before examining each test in light of the facts in this case, we address Employer and Insurer's threshold notice argument. Employer and Insurer point to language from *Woods* and ask us to impose as a threshold condition for recovery the requirement that an employer have notice of the horseplay activity giving rise to the injury. In the course of adopting both the New York rule and the course of employment test, *Woods* observed that the old participant/non-participant distinction would generally no longer be dispositive in making a compensation determination. *Id.* ¶ 15. Instead, *Woods* recognized, the nature and extent of an injured party's participation may often illuminate whether an employer had "actual or constructive notice" of or "reason to foresee" the activity giving rise to the horseplay. *Id.* And these questions are instructive under both tests. *See id.* Employer and Insurer have seized on these observations in *Woods* regarding notice and submit that the notice question is properly treated as a threshold inquiry divorced from the two tests. But asking the notice question in isolation is inconsistent with various principles within our workers' compensation jurisprudence. Moreover, because notice is but one consideration pertinent to the analyses required by the two tests, examining it in isolation will amount to both an incomplete and redundant exercise.

{20} For instance, a danger arises that any generalized notice inquiry may be understood in its negligence-related sense. Understood that way, notice might tell

15

us something about an employer's negligence in allowing certain activity or an employee's assumption of the risk. But, as we have repeatedly explained, the "policies served" by workers' compensation law differ from those served by tort law, and mingling their principles is often unhelpful to the task at hand. *See, e.g.*, *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 2007-NMCA-122, ¶ 9, 142 N.M. 583, 168 P.3d 155; *see also Segura v. J.W. Drilling, Inc.*, 2015-NMCA-085, ¶ 11, 355 P.3d 845 ("Workers['] compensation law is 'sui generis' and New Mexico courts have repeatedly declined to mingle its principles with those in other areas of law."). The Act, in fact, explicitly disavows many of those classic negligence-related concepts, and our Supreme Court recently has observed our compensation system is designed to "eliminate[] employer defenses that frequently prevented injured workers from recovering for workplace injuries under the common law." *Rodriguez v. Brand W. Dairy*, 2016-NMSC-029, ¶ 13, 378 P.3d 13; *see also* NMSA 1978, § 52-5-1 (1990) ("The workers' benefit system in New Mexico is based on a mutual renunciation of common law rights and defenses by employers and employees alike.").

**{21}** A closely related problem occurs when an isolated notice question makes concepts like "personal knowledge, personal acquiescence, [and] personal failure to prevent recurrence" dispositive in our compensation law. 2 Arthur Larson et al., *Larson's Workers' Compensation Law* § 23.05[2], at 23-8 (2017) (cautioning that

these concepts "have no place in compensation law"); *see also Crilly v. Ballou*, 91 N.W.2d 493, 502 (Mich. 1958) ("The employer's knowledge, actual or constructive, [its] acquiescence, [its] condonation, are not essential to the compensability of an injury under our statute."). As we recognized in *Woods*, a long line of authority had observed those concepts may tell us nothing at all about compensability, because "[t]he test of liability under the statute is not the master's dereliction, whether his own or that of his representatives acting within the scope of their authority." *Woods*, 1992-NMCA-046, ¶ 7 (quoting *Leonbruno v. Champlain Silk Mills*, 128 N.E. 711, 712 (N.Y. 1920) (Cardozo, J.)). The relevant question, instead, is "the relation of the service to the injury, of the employment to the risk." *Id.* (quoting *Leonbruno*, 128 N.E. at 712).

{22} Moreover, proper evaluation of any foreseeability or notice question must maintain the requisite focus on the "arising out of" and "in the course of" elements under the Act—considerations the New York rule and the course of employment test are designed to explore. *See* 2 Larson, *supra*, § 23.05[2], at 23-7 ("The controlling issue is whether the custom had *in fact* become part of the employment; the employer's knowledge of it can make it neither more nor less a part of the employment—at most it is evidence of incorporation of the practice into the employment."); *see also Crilly*, 91 N.W.2d at 502 ("If the employer is indisposed, remote from the operation, engrossed in other affairs, even enjoying a well-earned

respite in the Caribbean, will there be a suspension of compensation for operations developed in his absence, or their natural concomitants?"). Evaluation of the nature and extent of the horseplay and the nature and history of the employment environment, in other words, will often more closely probe the notice and foreseeability questions as those concepts must be understood for purposes of the Act. *See Woods*, 1992-NMCA-046, ¶ 21 (applying New York rule and analyzing nature of the horseplay and history, custom, and nature of employment environment); *id.* ¶ 26 (applying course of employment test and analyzing nature of the horseplay and history, custom, and nature of employment environment).

{23}    Application of the tests themselves, in addition, will ordinarily answer the question of whether any specific activity should have been foreseeable without the need for separate inquiry. *See* 2 Larson, *supra*, § 23.05[2], at 23-8 ("[A]lmost any practice which had continued long enough to qualify as a 'custom' and as 'part and parcel' of the employment could be found to be within the constructive knowledge of the employer."). Any activity constituting a regular incident of employment under the New York rule should thus satisfy any foreseeability requirement for purposes of the compensation determination, as should any activity not constituting a substantial deviation under the course of employment test. *See Wilson*, 1981-NMSC-123, ¶ 9 ("An injury reasonably incidental to the employment . . . is compensable."); *cf. Woods*, 1992-NMCA-046, ¶ 25 (summarizing application of

18

course of employment test and highlighting critical questions of whether the activity is "a usual practice on the job," and whether the job is "the type of employment that induce[s]" the activity); 2 Larson, *supra*, § 23.05[2], at 23-7 (stating that "[t]he controlling issue is whether the custom had . . . become part of the employment").

{24} Given the purpose of and ground covered by the New York rule and the course of employment test, we conclude the analytically sounder approach applies the tests first and reveals and incorporates their respective answers to the notice question along the way. We decline the invitation to establish any threshold notice requirement or preliminary inquiry in this context.

**IV. The WCJ Did Not Err in Determining Worker's Injuries Are Compensable**

{25} Regardless when the notice question is to be resolved, Employer and Insurer also contend that the WCJ erred in imputing notice to Employer based on a determination that Cloud was a supervisor engaged in horseplay with Worker and Employer's use of surveillance cameras. Employer and Insurer add that the WCJ erred in concluding Worker's injuries are compensable under either the New York rule or the course of employment test. The WCJ omitted explicit application of either test from his compensation order. As noted above, however, we have often explained that any combination of a denial of requested findings and the adoption of others may establish sufficient substance for our review. *See, e.g.*, *Jones*, 1993-

19

NMCA-100, ¶ 18; *Woods*, 1992-NMCA-046, ¶ 26 (reviewing WCJ's "findings, as well as the effect of what he refused to find"); *see also Maez*, 2015-NMCA-049, ¶ 31 (stating that we may affirm a compensation order if it is right for a reason not addressed by the WCJ). Here, the substance of the WCJ's findings and associated denials allow for our review of the compensation award under both tests, and we conclude both tests are satisfied in this case.

**A.     The New York Rule**

**{26}**     The New York rule, as previously noted, asks whether activity giving rise to an injury constitutes a regular incident of employment as opposed to an isolated act. *Woods*, 1992-NMCA-046, ¶ 8. The WCJ made various findings aiding an examination of that question. The WCJ found that Worker's injury occurred during regular work hours and on Employer's premises and that Worker and Cloud had previously engaged in horseplay of the same or similar nature on multiple occasions. Worker's testimony supported both findings; she testified that she and Cloud had engaged in this kind of activity at work, as frequently as "all the time." Cloud's testimony added support, as he testified they had engaged in this kind of behavior "from time to time." The WCJ added findings that Worker had no direct supervisor on duty at the time she suffered the injury and that Cloud was serving as a supervising employee for the entire facility at the time, as he often had in the past. Worker and Cloud gave testimony in support of those findings without

20

qualification; Pyle's testimony added only the qualification that Cloud may have served as more a point of contact for Worker than as a supervisor. The WCJ also found that Employer had counseled neither Worker nor Cloud for their horseplay at any time prior to the night Worker sustained her injuries and that Employer had in fact done nothing at all to curtail the "repeated horseplay" occurring at the detention center prior to the night of the injury. Pyle and Cloud's testimony supported those findings as they could recall no incidents of counseling or reprimand for prior horseplay. Worker's testimony corroborated the findings, as she had observed the facility seemed to have a "custom" of similar activity but could recall no instances of counseling or reprimand for the behavior.

{27}   Our whole record review reveals not only that the WCJ's findings were supported by the substantial evidence identified, but also that the evidence on these questions was largely undisputed. Beyond Worker's testimony and Cloud's deposition, there is little in the record regarding any history or absence of horseplay, its frequency, its nature or circumstances, or, more generally, the nature of the environment at the detention center at night. The limited additional evidence exploring those considerations came in the form of Pyle's deposition, which revealed only that Pyle was "unaware" of any history or reports of horseplay. Neither his deposition nor any other evidence in the record, however, provided any information regarding how often he or any other supervisory employee had

21

occasion to observe the employment environment at night. Whether Pyle's deposition created any conflict with the rest of the evidence presented is unclear given the limited information regarding his familiarity with the work environment at night; regardless, the WCJ was free to resolve any conflict in favor of the testimony given by Worker and Cloud. *See Salazar v. City of Santa Fe*, 1983-NMCA-134, ¶ 15, 102 N.M. 172, 692 P.2d 1321 ("We will not disturb the trial court's resolution of conflicting evidence[.]").

{28} Despite the evidence demonstrating that horseplay was a regular incident of employment at the detention center, Employer and Insurer maintain the fact that Employer had policies in place prohibiting horseplay should weigh heavily in their favor. In support, they rely on *Woods* and our decision in *Cox v. Chino Mines/Phelps Dodge*, 1993-NMCA-036, 115 N.M. 335, 850 P.2d 1038, both of which affirmed non-compensability determinations where employers had probative policies in place. A closer look at each case reveals that neither gave as much weight to the policies as Employer and Insurer would have us impart here.

{29} Whether *Cox* can tell us much is questionable; it was a case featuring not horseplay but sexual harassment, and we expressed reservations there about whether horseplay cases and sexual harassment cases were sufficiently analogous for purposes of borrowing legal principles. *See* 1993-NMCA-036, ¶ 15. We maintain those concerns today. Even were the contexts comparable, *Cox*

22

highlighted in reaching its conclusion not only the employer's policy prohibiting harassment, but also the worker's concessions she had never previously experienced harassment in her lengthy career and she was unaware of any other history of harassment in the workplace. *See id.* Policy prohibitions aside, those concessions were integral to the imported New York rule analysis in *Cox*. *See id.* (noting, in addition to specific policy prohibitions in place, "[c]laimant's claim fails because sexual harassment was not a regular incident of the employment"). Our record, by contrast, reveals no such concessions.

{30}     The *Woods* record gave rise to a similarly fact-specific analysis, featuring evidence that horseplay of the kind giving rise to the subject injury was exceptionally rare. *See* 1992-NMCA-046, ¶ 6. Because the horseplay was so uncommon, moreover, we concluded it appropriate to draw the inference that the employer's horseplay prohibitions largely controlled the employment environment, and that inference supported the conclusion the activity did not constitute a regular incident of employment. *See id.* Neither the fact of exceptional rarity nor the associated inference that a written policy has controlled the customs of the environment, however, are supported on our record here.

{31}     Instead, based on our whole record review, we determine that substantial evidence supported the WCJ's findings that Worker and Cloud had previously engaged in horseplay, that Employer had not previously counseled Worker or

Cloud regarding the horseplay, and that Employer had done nothing else to curtail repeated horseplay at the detention center. Those findings in turn support a determination that the activity giving rise to the injury constituted a regular incident of employment, as opposed to an isolated act, satisfying the New York rule and answering at the same time in the affirmative the question of whether the activity was reasonably foreseeable. *See id.* ¶ 19 (highlighting case where compensability was justified because "the risks incident to this employment included risks associated with the friendly jostling customary to the restaurant"). The WCJ's findings identified here are sufficient on their own to establish the activity at issue was reasonably foreseeable for purposes of any notice requirement under our cases and the language of the Act. Having settled that question, it is not necessary to address whether the associated findings Employer and Insurer challenge—i.e., that Cloud was a supervisor and his knowledge could be imputed to Employer and that the surveillance cameras gave Employer notice of the horseplay—were supported by substantial evidence.

{32}     Satisfaction of the New York rule, we note, ends our inquiry under *Woods*, as the claimant need only prevail under one of the applicable analytical frameworks to establish the injury is compensable. *See id.* ¶ 13. The parties having addressed the course of employment test in their briefing, however, we examine that test as well.

24

## B. Course of Employment Test

{33} The course of employment test, as previously explained, asks whether activity causing an injury constitutes a substantial deviation from employment and examines: (1) the scope and gravity of any deviation; (2) the completeness of any deviation; (3) the acceptance of horseplay in the environment; and (4) the extent to which the environment may be expected to include similar horseplay. Application of these considerations reveals that Worker's injury arose out of and in the course of her employment as required by the Act.

{34} With respect to the third and fourth factors, the WCJ's findings neglected to address specifically the questions of whether horseplay had become accepted in the environment and whether the environment might be expected to include similar horseplay. The WCJ's findings, however, that Worker and Cloud had previously engaged in similar activity and that Employer failed to "curtail the repeated horseplay" at the facility address these questions implicitly, and they provide substance sufficient for purposes of our whole record review. *See Molinar*, 2018-NMCA-011, ¶ 42 (examining "express" and "concomitant implied" findings). As to the third factor—the extent that horseplay was accepted or tolerated at the detention center—Worker testified in support of various contentions, as identified in our analysis of the New York rule. In short, Worker testified that horseplay was widespread among employees and that Cloud had often engaged in similar

25

behavior previously. She testified that her direct supervisor had brushed her off when she had confided that Cloud was "irritating" her. She added that despite this history, she was unaware of any instances of counseling or reprimand of any employee for horseplay. Cloud added testimony that he and Worker had engaged in similar behavior previously and that he also could not recall any instances of counseling or reprimand for horseplay. Pyle was likewise unaware of any instances of counseling or reprimand. As to the fourth factor—whether the environment might generally be expected to include horseplay—Worker testified that the facility featured substantial downtime and she had been waiting during a familiar lull in work when the horseplay on the night in question began. All this evidence taken together suggests both the third and fourth course of employment considerations weigh in Worker's favor here. *See Woods*, 1992-NMCA-046, ¶ 25 (emphasizing considerations of whether "horseplay was a usual practice on the job" and whether there were "lulls in activity or shared tasks that would encourage horseplay").

{35}    With respect to the first and second factors, we note again as a prefatory matter that specific findings on scope, gravity, and completeness are not contained in the WCJ's order. Nevertheless, as we have often remarked, we may draw various reasonable inferences from the facts found in determining whether a "fair construction of all of them, taken together," supports the judgment. *Robey v.*

26

*Parnell*, 2017-NMCA-038, ¶ 41, 392 P.3d 642 (quoting *H.T. Coker Constr. Co. v. Whitfield Transp., Inc.*, 1974-NMCA-002, ¶ 9, 85 N.M. 802, 518 P.2d 782). The WCJ's order provides sufficient substance for our review, given the findings actually made and the ultimate conclusion of compensability, which implicitly determined that Worker's injury arose out of and in the course of her employment. *See id.* ("If, from the facts found, the other necessary facts may be reasonably inferred, the judgment will not be disturbed." (internal quotation marks and citation omitted)); *Salazar*, 1983-NMCA-134, ¶ 15 ("[T]he trial court's findings answered the factual questions . . . necessary to determine whether decedent had returned to the course and scope of his employment.").

{36} As to the first and second factors, Worker's testimony that the whole incident occurred over the course of just a few moments near the booking area supports a determination that any deviation was narrow in scope and neither grave nor complete. *Cf. Salazar*, 1983-NMCA-134, ¶¶ 14-15 (affirming conclusion that two-and-a-half hour deviation from commute home in employer vehicle constituted no abandonment of employment). Cloud's testimony regarding duration corroborated Worker's account. Worker's testimony regarding the frequent downtime and the horseplay that often arose at work during the downtime also support a determination that any deviation was narrow in scope and neither grave nor complete. *See, e.g.*, *Whitehurst v. Rainbo Baking Co.*, 1962-NMSC-126,

27

¶ 24, 70 N.M. 468, 374 P.2d 849 ("That there was no temporary abandonment of the employment is evidenced by the fact that while taking the coffee break appellant was, at the same time, waiting for the delivery of a truck part in order to complete his work."); *see also, e.g.*, *Dehart v. Betty Breaux Pers., Inc.*, 535 So. 2d 456, 458 (La. Ct. App. 1988) ("The courts have consistently recognized that, during idle periods in the course of employment, working men will engage in jocular activities with fellow employees"); 2 Larson, *supra*, 23.07[6], at 23-27 ("[I]t is suggested that the idleness factor is relevant to this extent, that the duration and seriousness of the deviation which will be called substantial should be somewhat smaller when the deviation necessitates the dropping of active duties than when it does not.").

{37} Employer and Insurer nevertheless contend that *Woods* compels a conclusion that the deviation here was substantial. *Woods*, however, featured a record supporting findings that (1) the horseplay was highly unusual given the history of the employment environment as reported by employees, and (2) the resulting deviation was substantial, in the form of rapid, violent escalation of a physical confrontation between employees of different employers. *See* 1992-NMCA-046, ¶¶ 4, 6. The record here, by contrast, reveals that horseplay had become an expected part of the environment, it occurred often during downtime, and any deviation was minor, brief, and incomplete. *See, e.g.*, *Petrik v. JJ*

28

*Concrete, Inc.*, 2015 SD 39, ¶ 22, 865 N.W.2d 133 (concluding injury arising from "running through job site, . . . [h]owever misguided" or rare, was "momentary and impulsive deviation during a lull in work" and therefore insubstantial). In sum, substantial evidence supports the determination that any deviation was insubstantial, satisfying the course of employment test, as well as resolving that the activity here was reasonably foreseeable for purposes of compensation under the Act.

{38}    We, therefore, conclude that, regardless whether the New York rule or the course of employment test is applied, substantial evidence supports the WCJ's findings and the WCJ properly determined that Worker's injuries are compensable under the Act because the injuries arose out of and in the course of employment as required by Section 52-1-28(A)(1) of the Act.

**CONCLUSION**

{39}    For the foregoing reasons, we affirm the WCJ's compensation order.

{40}    **IT IS SO ORDERED.**


_____
**JENNIFER L. ATTREP, Judge**


**WE CONCUR:**


_____

**MICHAEL E. VIGIL, Judge**


_____
**J. MILES HANISEE, Judge**